# In the United States Court of Federal Claims

No. 13-476C
(Filed:  May 23, 2017)

**************************************

| | |
|---|---|
| SILVER BUCKLE MINES, INC.,     * | Mining Law of 1872; 30 U.S.C. § 28f; |
|                  * | Claim Maintenance Fees; Federal Land |
|      Plaintiff,        * | Policy and Management Act; Summary |
|                  * | Judgment; RCFC 56; Illegal Exaction; |
| v.                        * | Voluntary Payment Doctrine; Anti- |
|                  * | Windfall Doctrine; Class Action |
| THE UNITED STATES,       * | Certification; RCFC 23; Definition of |
|                  * | Class; Conflict of Interest |
|      Defendant.     * | |

**************************************

<u>Frank R. Siderius</u>, Seattle, WA, for plaintiff.

<u>Geoffrey M. Long</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

      Before the court are the parties' cross-motions for summary judgment, filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  Plaintiff has also moved for class certification pursuant to RCFC 23.  For the reasons stated below, the court grants plaintiff's motion for summary judgment, denies defendant's cross-motion for summary judgment, and grants plaintiff's motion for class certification.

## I.  BACKGROUND

      Plaintiff Silver Buckle Mines, Inc. ("Silver Buckle") is an Idaho corporation and holder of eighty-seven active, unpatented lode mining claims in Idaho, seventy-two of which were located prior to August 10, 1993.  Pl.'s Mot. Summ. J. ("Pl.'s Mot.") 1; Decl. of Dennis O'Brien in Supp. of Pl.'s Mot. ("O'Brien Decl.") ¶¶ 2-3.  Plaintiff's suit relates to an annual claim maintenance fee imposed by the Bureau of Land Management ("BLM") on mining claims. Compl. §§ I-II, VI-VII;[1] <u>see</u> 30 U.S.C. § 28f (2012).

---

      [1]  The complaint is formatted largely in sections numbered with roman numerals, rather than the paragraph format called for by this court's rules.  <u>See</u> RCFC 10(b) ("A party must state its claims or defenses in numbered paragraphs . . . .").  This opinion will refer to the sections of the complaint according to the Roman numerals assigned by plaintiff when practicable, and otherwise by page number.

Mining claims are governed by the General Mining Act of 1872 ("Mining Law of 1872"), ch. 152, 17 Stat. 91 (codified as amended at 30 U.S.C. §§ 22-54), and section 314 of the Federal Land Policy and Management Act of 1976 ("FLPMA"), Pub. L. No. 94-579, 90 Stat. 2743, 2769-70 (codified as amended at 43 U.S.C. § 1744 (2012)).  Prior to 1993, the BLM required that mining claim holders conduct a minimum level of assessment work on their claims and comply with the FLPMA's annual filing requirements to continue holding their mining claims. Compl. § IV; Pl.'s Mot. 2.  In 1993, Congress changed the law to require claim holders to pay an annual maintenance fee to the BLM in lieu of the assessment work and related filing requirements.  Pl.'s Mot. 2.  The new law stated:

> The holder of each unpatented mining claim, mill or tunnel site located pursuant to the Mining Laws of the United States, whether located <u>before or after</u> the enactment of this Act, shall pay . . . a claim maintenance fee . . . in lieu of the assessment work requirement contained in [30 U.S.C. §§ 28-28e] . . . and the related filing requirements contained in [43 U.S.C. § 1744(a), (c)].

Omnibus Budget Reconciliation Act of 1993 ("1993 Act"), Pub. L. No. 103-66, § 10101(a), 107 Stat. 312, 405 (codified as amended at 30 U.S.C. § 28f) (emphasis added).

Then, in 2011, Congress again amended the statute that governs the fee structure, eliminating the claim maintenance fee for unpatented lode mining claims, mill sites, and tunnel sites (collectively, "unpatented nonplacer claims") located before August 10, 1993, and increasing the maintenance fee for unpatented placer mining claims.  The new law stated:

> The holder of each unpatented lode mining claim, mill site, or tunnel site, located pursuant to the mining laws of the United States <u>on or after</u> August 10, 1993, shall pay . . . a claim maintenance fee . . . .
>
> . . . .
>
> . . . The holder of each unpatented placer mining claim located pursuant to the mining laws of the United States located <u>before, on, or after</u> August 10, 1993, shall pay . . . [a] claim maintenance fee . . . .

Consolidated Appropriations Act of 2012 ("2012 Act"), Pub. L. No. 112-74, § 430, 125 Stat. 786, 1047 (2011) (codified as amended at 30 U.S.C. § 28f(a)) (emphasis added).  As a result, "the most natural reading" of the changes made by the 2012 Act "indicated that the maintenance fee had been eliminated for unpatented nonplacer claims located before August 10, 1993."[2] <u>Silver Buckle Mines, Inc. v. United States</u>, 117 Fed. Cl. 786, 789 (2014).

---

[2]  The court will refer to claims located before August 10, 1993, as "pre-1993" claims.

Disregarding this change in the law's text, the BLM promulgated regulations that continued to require maintenance fees for the 2013 assessment year on pre-1993 unpatented nonplacer claims.  See Administration of Mining Claims and Sites, 77 Fed. Reg. 44,155 (July 27, 2012) (to be codified at 43 C.F.R. pt. 3830).  Although the regulation purported to "merely codif[y] statutorily imposed procedural changes," id. at 44,155, and recognized that the BLM may not "exercise[] discretion as to the level of fees or when they are due," id. at 44,156, the maintenance fee for the 2013 assessment year was set at $140 for all unpatented nonplacer claims, id. at 44,158.  See also Compl. § VIII (discussing the regulation).  On August 10, 2012, the lessee of plaintiff's claims paid the maintenance fees for the 2013 assessment year.[3]  Id. § I; Pl.'s Mot. 1-2; Def.'s Cross-Mot. for Summ. J. ("Def.'s Mot.") 5; Def.'s Mot. App. 1-5.  No other filings regarding plaintiff's claims were made for the 2013 assessment year, and the payment was made without protest or objection.  Def.'s Mot. 5; Def.'s Mot. App. 6-8, 19.

On March 26, 2013, Congress once again amended the law by reinserting the word "before," so that the claim maintenance fees would be required for unpatented nonplacer claims located "before, on, or after August 10, 1993."[4]  Consolidated and Further Continuing Appropriations Act of 2013 ("2013 Act"), Pub. L. No. 113-6, § 1403, 127 Stat. 198, 419 (codified at 30 U.S.C. § 28f).

On July 16, 2013, plaintiff filed suit seeking "judgment against the United States . . . for refunds of the maintenance fees illegally exacted" by the BLM in 2012 for the 2013 assessment year ("2013 maintenance fees").[5]  Compl. 8.  Plaintiff also seeks to initiate a class action, pursuant to RCFC 23, on behalf of itself and other pre-1993 unpatented nonplacer claim holders ("pre-1993 claimants") for refunds of the 2013 maintenance fees.  Id. § X; Pl.'s Mot. for Class Certification ("Pl.'s Mot. Class Cert.") 1-2.

On September 16, 2013, defendant moved for dismissal pursuant to RCFC 12(b)(6). Defendant argued that (1) Congress did not intend to eliminate the maintenance fees for pre-1993

---

[3]  The lessee has assigned all rights to recover the claim maintenance fees for the 2013 assessment year to plaintiff.  Compl. § I; Pl.'s Mot. 1-2.

[4]  The regulation setting the claim maintenance fees was not amended until 2014, when the BLM issued a final rule updating the claim location and maintenance fees "based upon the change in the [Consumer Price Index] from December 31, 2008, to December 31, 2013." Required Fees for Mining Claims or Sites, 79 Fed. Reg. 36,662 (to be codified at 43 C.F.R. pt. 3830).  The new fees first applied to payments due by September 1, 2014, for the 2015 assessment year.  Id. at 36,663.

[5]  "An illegal exaction claim may be maintained when the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum that was improperly paid, exacted, or taken from [the plaintiff] in contravention of the Constitution, a statute, or a regulation."  Piszel v. United States, 833 F.3d 1366, 1382 (Fed. Cir. 2016) (internal quotation marks omitted).  In other words, an illegal exaction "concerns 'the recovery of monies that the government has required to be paid contrary to law.'"  Id. (quoting Aerolineas Argentinas v. United States, 77 F.3d 1564, 1572 (Fed. Cir. 1996)).

unpatented nonplacer claims when it passed the 2012 Act, and that the statutory language could be read in historical context to authorize collection of the fees; (2) the BLM had independent authority under the Independent Offices Appropriation Act ("IOAA"), 31 U.S.C. § 9701 (2012), to impose the fees; and (3) plaintiff did not object to the fees at the time of payment and thus was barred from seeking recovery under the voluntary payment doctrine.  Silver Buckle, 117 Fed. Cl. at 790.  In an August 8, 2014 opinion, the court confirmed its jurisdiction over plaintiff's claim, id. at 791, and denied defendant's motion, id. at 798.  The court ruled against defendant's first two contentions,[6] id. at 794-95, 797, and reserved consideration of the affirmative defense of voluntary payment until the record was more fully developed, id. at 798.

After the court denied its motion to dismiss, defendant filed an answer, and shortly thereafter, the parties filed cross-motions for summary judgment pursuant to RCFC 56.  Then, while the parties were briefing their cross-motions, plaintiff moved for class certification pursuant to RCFC 23—a motion defendant opposes.

Following oral argument on the parties' cross-motions for summary judgment and plaintiff's motion for class certification, the court ordered supplemental briefing regarding (1) the requirements for filing a notice of intent to hold a mining claim pursuant to 43 U.S.C. § 1744(a) and applicable regulations and (2) the effect of the United States Supreme Court ("Supreme Court") decision in King v. Burwell, 135 S. Ct. 2480 (2015), on the case at bar.  The case was reassigned to the undersigned on March 30, 2017.

## II.  CROSS-MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex, 477 U.S. at 323.  The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).  However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations

---

[6] In its cross-motion for summary judgment, defendant "acknowledges" that the court's legal holdings at the motion to dismiss stage "are binding at this stage of the litigation," but notes that it "reserves its right to challenge those holdings on appeal."  Def.'s Mot. 7 n.3.  In particular, defendant emphasizes that it reserves the right to challenge the portion of the court's ruling concerning the IOAA.  Id.

omitted). Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

In ruling on cross-motions for summary judgment, the court "must evaluate each motion on its own merits." First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003). If neither party meets its burden, then the court must deny both motions. Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998).

The relevant statutory and regulatory background and factual history, outlined above, are undisputed. Therefore, according to plaintiff, there is "no genuine dispute as to any material fact," and it is "entitled to a judgment as a matter of law." Pl.'s Mot. 1. Plaintiff argues that the "express and unambiguous language" of the 2012 Act's changes to 30 U.S.C. § 28f eliminated the maintenance fee requirement for the 2013 assessment year for all pre-1993 unpatented nonplacer claims. Id. at 4. Nevertheless, plaintiff contends, the BLM "ignored the statutory change and coerced payment" of the 2013 maintenance fees of $140 per claim from plaintiff. Id. Plaintiff highlights the court's prior determination that the "BLM went beyond the authority granted by section 28f," as it existed at the time, in imposing 2013 maintenance fees on pre-1993 unpatented nonplacer claims. Id. at 4-5; see also Silver Buckle, 117 Fed. Cl. at 793 ("With respect to the year 2013 assessment fee, section 28f clearly made no allowance for a maintenance fee on pre-1993 unpatented nonplacer claims.").

Defendant responds with two arguments. First, defendant suggests that a ruling in favor of plaintiff would give plaintiff a windfall for the 2013 assessment year since plaintiff would not have paid maintenance fees, performed assessment work, or completed certain FLPMA-required filings. Def.'s Mot. 6-8. Second, defendant invokes the voluntary payment doctrine, which provides that a payment voluntarily made cannot form the basis of an illegal exaction claim. Id. at 8-10. Defendant avers that it is entitled to judgment as a matter of law based on either ground. Id. at 5-6. The court addresses each of defendant's contentions.

### A. The Voluntary Payment Doctrine Does Not Bar Plaintiff's Illegal Exaction Claim

The voluntary payment doctrine has been recognized for over two centuries. See, e.g., Elliot v. Swartwout, 35 U.S. (10 Pet.) 137, 143 (1836) ("No action lies to recover back money paid voluntarily . . . ." (relying in part on Fowler v. Shearer, 7 Mass. 14 (1810)). A voluntary payment is a payment that is made "without objection, notice, or protest." United States v. Edmonston, 181 U.S. 500, 505 (1901). The doctrine applies to payments involving the government as well as payments between private parties. Id. at 511 ("[M]oney . . . voluntarily paid to the government cannot be recovered."). However, the doctrine does not apply, and thus failure to protest is immaterial, when payments are "exacted in violation of a statute intended to benefit the person seeking recovery." Alyeska Pipeline Serv. Co. v. United States, 224 Ct. Cl. 240, 261-62 (1980). In other words, the voluntary payment doctrine is inapplicable when the payment is made under protest, is the product of coercion or is otherwise not voluntary, or is made in contravention of a statute intended to benefit the payer. Plaintiff does not allege that the 2013 maintenance fees were paid under protest, but argues that (1) payment of those fees was not voluntary and (2) the 2012 Act was intended to benefit pre-1993 claimants, such as plaintiff.

**1.  Paying the 2013 Maintenance Fees Was Not a Voluntary Act, Thus No Protest Was Necessary**

The court first examines plaintiff's coercion argument.  In Edmonston, the plaintiff purchased land from the federal government in excess of the statutorily set price and sought a refund of the overcharge. 181 U.S. at 500-01.  Because the plaintiff had entered into the land contract of his own volition and had failed to protest the overcharge, his claim was denied under the voluntary payment doctrine.  Id. at 515.  Defendant asserts that Edmonston is controlling law, thus plaintiff's illegal exaction claim is barred because plaintiff's 2013 maintenance fees were paid without protest.  Plaintiff, however, argues that the voluntary payment doctrine does not apply because, unlike the payment in Edmonston, its payments to the BLM were the product of coercion.  According to plaintiff, since the failure to pay maintenance fees for an unpatented mining claim "shall conclusively constitute a forfeiture" of that claim under 30 U.S.C. § 28i, it was forced to pay the fees (through its lessee) or risk losing its claim.

Plaintiff invokes Swift & Courtney & Beecher Co. v. United States, 111 U.S. 22 (1884), in support of its coercion argument.  Swift involved the payment of commissions under the internal revenue statute for the purchase of adhesive stamps.  Id. at 24-25.  In Swift, the Supreme Court recognized that the plaintiff "had no choice" because it was required "to submit to an illegal exaction or discontinue its business."  Id. at 28-29.  The Supreme Court posited that "[m]oney paid, or other value parted with, under such pressure, has never been regarded as a voluntary act" because the parties did not "stand upon an equal footing" and the payer "really had no choice."  Id. at 29-30 (internal quotation marks omitted); accord id. at 30 (explaining that there is no voluntary payment when a fee is illegally collected under color of law, including a demand for more than a statutorily prescribed amount).  Plaintiff argues that while it did not face a threat to its entire business like the plaintiff in Swift, it nonetheless faced a choice that hardly rendered compliance a voluntary act:  it either had to pay the maintenance fees, which the BLM continued to demand, or risk losing seventy-two of its unpatented lode mining claims.

Defendant dismisses Swift's applicability to the instant case for three reasons: (1) Edmonston was decided after Swift, and thus Swift should be construed as having been overruled; (2) unlike the case at bar, individuals "related to the plaintiff" protested the payment in Swift, which satisfied the requirement that a claimant protest the exaction rather than acquiesce; and (3) the coercion at issue in Swift (discontinuance of the claimant's entire business) was far greater than any coercion faced by plaintiff here.  Def.'s Mot. 9.  Defendant's position is unpersuasive.  First, defendant's argument that Edmonston overruled Swift lacks merit because the Edmonston Court expressly distinguished the two cases.  See Edmonston, 181 U.S. at 514 ("[W]e fail to see anything in the record which brings this case within the scope of [Swift].").  Second, while defendant is correct that parties affiliated with the claimant protested the payment in Swift, the Edmonston Court recognized that there are situations "in which the formality of a protest or objection is unnecessary" in order to recoup a payment.  Id. (referring generally to Swift, 111 U.S. at 22); accord Am. Airlines, Inc. v. United States, 551 F.3d 1294, 1298-99 (Fed. Cir. 2008) ("Failure to challenge an improper agency action does not ratify such action or insulate it from later objection and litigation.").  Finally, even though plaintiff did not risk discontinuance of its entire business, it still faced the possibility of significant negative consequences from the BLM if the 2013 maintenance fees were left unpaid.

In any event, Edmonston is distinguishable from the instant case. Edmonston involved a contract for the purchase of land, which the plaintiff was under no compulsion to purchase. 181 U.S. at 504 ("[T]he transaction between the officials of the land office and the claimant was at the time acceptable to both and without any complaint on the part of the petitioner."). Thus, the transaction in Edmonston was "purely voluntary on [the plaintiff's] part," and the plaintiff's failure to object to the payment meant any recovery was barred by the voluntary payment doctrine. Id. at 515. By contrast, the 2013 maintenance fees at issue in this case were not optional because unpaid fees could have jeopardized plaintiff's rights to continue holding its pre-1993 unpatented nonplacer claims. See, e.g., 43 C.F.R. § 3830.21(d)(1) (providing that the "annual maintenance fee" for unpatented nonplacer claims "must be paid on or before September 1 each year" (emphasis added)); id. § 3834.11(a)(2) ("You must pay an annual maintenance fee [as listed in 43 C.F.R. § 3830.21] . . . in order to maintain a mining claim or site for the upcoming assessment year." (emphasis added)); O'Brien Decl. ¶ 5 ("[I]t was our understanding that failure to pay claim maintenance fees would result in forfeiture of the claims."). In fact, defendant has suggested throughout this litigation that failure to comply with the BLM's commands meant risking forfeiture of mining claims or challenge by rival claimants. See, e.g., Def.'s Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss 3-5 & n.1 ("[F]ailure to secure a mining claim for a particular year results in that claim being declared void by operation of law . . . ."); Def.'s Resp. to Pl.'s Mot. for Class Cert. ("Def.'s Opp'n to Class Cert.") 4-5 (suggesting that if claimants receive a refund of the 2013 maintenance fees, their claims could be "void by operation of law . . . [or] at risk of challenge by rival claimants" if they did not complete the FLPMA filings); see also Compl. Ex. B at 2 (containing instructions to BLM Form 3830-5, which noted that "[f]ailure to submit all the required information . . . may preclude the BLM's acceptance of the maintenance fee payment, which may result in forfeiture of the mining claim(s) or site(s) by the claimant").

Given the potential repercussions of disobeying the BLM's demands in this situation, defendant's attempt to portray the maintenance fee requirement as a voluntary transaction analogous to the land sale contract in Edmonston is unavailing. Accordingly, the decision in Edmonston does not dictate the outcome of this case. Rather, as plaintiff argues, this case, unlike Edmonston, is "within the scope" of Swift. Thus, payment of the 2013 maintenance fees was not a voluntary act, and therefore no protest or objection when making the payment was necessary to preserve plaintiff's illegal exaction claim.

## 2. The 2012 Act Was Intended to Benefit Plaintiff and Similarly Situated Claimants

Next, the court examines plaintiff's intended-to-benefit argument. In addition to relying on Swift, plaintiff states that the decision of the United States Court of Claims ("Court of Claims"), the predecessor court to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), in Alyeska is applicable to the instant case.[7]

---

[7] "There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims." Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006).

In Alyeska, a pipeline service company and its controlling oil companies sought a refund of money the United States Department of the Interior ("DOI") had impermissibly charged it for expenses incurred in approving the construction of an oil pipeline. 224 Ct. Cl. at 243.  The Alyeska court was tasked with determining whether the plaintiffs' voluntary agreement to pay those expenses obviated the statutory bar to their assessment. Id. at 260.  The Court of Claims explained that "a voluntary payment may be recovered if the statute barring the payment was enacted for the benefit of the person seeking recovery but may not be recovered if enacted for the benefit of another," id. at 261, and emphasized that when a payment is "exacted in violation of a statute intended to benefit the person seeking recovery, it is immaterial that that person failed to protest when making the payment," id.

The Alyeska court's focus on the beneficiary of a particular statute stems from a long "line of cases originally arising out of sales of surplus ships by the government after World War II." Id.  In these decisions, the Court of Claims held that "[ship] buyers who had been charged more than the prices set by Congress could recover the excess, even though they had entered into contracts to pay those higher sums." Rough Diamond Co. v. United States, 173 Ct. Cl. 15, 21 (1965).  Although the transactions were voluntary in those cases, the Court of Claims distinguished them from Edmonston because the "Congressional purpose" of benefitting ship buyers "was strong enough to override any general legal doctrine" such as the voluntary payment doctrine.[8] Id. (internal quotation marks omitted).  In contrast, the Edmonston court had not found a "sufficiently strong" congressional purpose in the land sale statute at issue "to overcome the general legal doctrine relating to voluntary payments." Sprague S.S. Co. v. United States, 145 Ct. Cl. 642, 647 (1959).

Plaintiff argues that pre-1993 claimants were "[t]he obvious and only beneficiaries" of the 2012 Act's elimination of the 2013 maintenance fees for pre-1993 unpatented nonplacer claims. Pl.'s Mot. 6.  Therefore, according to plaintiff, under Alyeska the voluntary payment doctrine does not bar recovery here.  In response, defendant stresses that, as an "inferior court, the Court of Claims [in Alyeska] did not have the authority to modify the Supreme Court's decision in Edmonston." Def's Mot. 9 n.4.  Further, defendant avers that claim maintenance fees under 30 U.S.C. § 28f are for the BLM's benefit, and thus Alyeska is inapplicable even if it is good law.[9]

_____

[8] Both Alyeska and Rough Diamond applied the "congressional purpose" limitation on the voluntary payment doctrine beyond the sales of ships after World War II.

[9] Defendant suggests that this court, in its opinion at the motion to dismiss stage, "held that 'the purposes of the fees are specifically to discourage speculation and to raise revenue for BLM,'" rather than to benefit holders of the mining claims. Def.'s Mot. 9 (quoting Silver Buckle, 117 Fed. Cl. at 795).  This reading of the court's decision is incorrect.  Rather, the court merely noted that "the government acknowledges that the purposes of the fees are specifically to discourage speculation and to raise revenue for BLM." Silver Buckle, 117 Fed. Cl. at 795 (emphasis added) (citations omitted).  Further, the context of this statement is important.  Following the above sentence, the court observed that these particular purposes were actually prohibited by Supreme Court precedent.  In addition, immediately before the above sentence, the court remarked that defendant previously argued that claim maintenance fees are not a tax because those fees are "for a service or thing of value bestowing a benefit on the applicant not

Defendant's concern that <u>Alyeska</u> impermissibly "modified" the holding of the Supreme Court in <u>Edmonston</u> is misplaced. The <u>Alyeska</u> court—following a line of cases, including many in which review was sought from and denied by the Supreme Court—held that <u>Edmonston</u> was not applicable to cases where "payments were exacted in violation of a statute intended to benefit the person seeking recovery." <u>Alyeska</u>, 224 Ct. Cl. at 261-62. Thus, <u>Alyeska</u> does not modify or circumvent Supreme Court precedent, but rather distinguishes it and explains its inapplicability in certain situations.[10]

Defendant's suggestion that plaintiff would need to point to legislative history to show that it benefitted from the statutory provision at issue is similarly misplaced. While <u>Alyeska</u> partially relies on legislative history to demonstrate that the relevant statute in that case benefitted the plaintiff, the line of cases from which <u>Alyeska</u> is derived relies on statutory language rather than legislative history to demonstrate a congressional purpose of benefitting a discrete group. <u>See, e.g.</u>, <u>Chris Berg, Inc. v. United States</u>, 192 Ct. Cl. 176, 182-83 (1970); <u>Se. Oil Fla. v. United States</u>, 127 Ct. Cl. 409, 416-17 (1953). If a statute "appears intended to define and state the rights of a class of persons, it is presumptively intended to benefit those persons." <u>Chris Berg</u>, 192 Ct. Cl. at 183; <u>see also</u> <u>Fletcher v. United States</u>, 183 Ct. Cl. 1, 9 (1968) ("We have no doubt that the [statute] properly here involved was made for protection of employees, among other purposes, as appears upon its face . . . .").[11]

As defendant correctly states, statutes should be read in light of their underlying "legislative plan." <u>King</u>, 135 S. Ct. at 2496. According to defendant, if Congress meant to initiate a significant change to 30 U.S.C. § 28f, such as eliminating claim maintenance fees, it

---

shared by members of society." <u>Id.</u> (emphasis added). Ultimately, however, the proper question is whether the elimination of the maintenance fees—not their enactment—was for plaintiff's benefit. <u>See</u> <u>infra</u>.

[10] Assuming, without deciding, that the Court of Claims erred in <u>Alyeska</u>, it is not within this court's purview to question circuit precedent. <u>See</u> <u>Strickland v. United States</u>, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005) ("[A] trial court may not disregard its reviewing court's precedent . . . [unless] the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision."); <u>see also</u> <u>S. Corp. v. United States</u>, 690 F.2d 1368, 1369 (Fed. Cir. 1982) ("[T]he holdings of . . . the United States Court of Claims . . . shall be binding as precedent in this court.").

[11] The Court of Claims also analyzed the purpose of a law based on statutory construction in <u>Rough Diamond</u>, 173 Ct. Cl. at 15, which was the first decision in which the Court of Claims extended the "congressional purpose" exception to the voluntary payment doctrine beyond the sales of surplus World War II ships. In <u>Rough Diamond</u>, cotton exporters were seeking to recover a portion of the price they had paid the federal government for surplus cotton, which was higher than the prevailing market price. <u>Id.</u> at 17. The <u>Rough Diamond</u> court ultimately denied the claim based on its finding that the statute at issue was intended to benefit the producers, rather than exporters, of cotton. <u>Id.</u> at 22-23. Although the court cited legislative history in reaching this conclusion, it also noted that the congressional purpose of benefitting the producers of cotton was "manifest on the surface" of the statute. <u>Id.</u> at 23.

"likely would have done so" in a "prominent manner." Id. at 2495.  However, as plaintiff observes, the principle of examining the overall "legislative plan" is only relevant when statutory language is ambiguous.  Context is important in determining whether statutory language is plain as an initial matter, but when there is no ambiguity a statute must be enforced "according to its terms."  Id. at 2489; accord Kingdomware Techs., Inc. v. United States, 136 S. Ct. 1969, 1976 (2016) ("In statutory construction, we begin with the language of the statute.  If the statutory language is unambiguous and the statutory scheme is coherent and consistent . . . the inquiry ceases." (citations and internal quotation marks committed)); Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  Here, there is no ambiguity in the relevant statute, even given its history and overall legislative scheme.  Silver Buckle, 117 Fed. Cl. at 793.  Thus, as explained in the court's August 7, 2014 opinion in this case, id. at 792-93, it would be improper for the court to look beyond the language of 30 U.S.C. § 28f itself.

In any event, defendant confuses the proper inquiry here when it argues that the claim maintenance fees under 30 U.S.C. § 28f are for the BLM's benefit.  The relevant inquiry is not who benefits from the fees in general, but rather who benefited from the 2012 Act's elimination of the fees.  A plain reading of 30 U.S.C. § 28f following the 2012 Act's passage indicates that Congress eliminated maintenance fees for pre-1993 unpatented nonplacer claims.  See id. at 793.  No further inquiry is required (or even appropriate).  Id.  Facially, the changes to the maintenance fee structure inure to the benefit of plaintiff and other pre-1993 claimants.  The 2012 Act necessarily intended to benefit pre-1993 claimants because no other class or group would benefit from the elimination of the 2013 maintenance fees.  Therefore, pursuant to Alyeska, the voluntary payment doctrine does not bar plaintiff's recovery of the 2013 maintenance fees.

### B.  The Anti-Windfall Doctrine Does Not Bar Plaintiff's Illegal Exaction Claim

Defendant's second argument is that refunding the 2013 maintenance fees would result in plaintiff receiving a "windfall."  Def.'s Mot. 6.  Defendant notes that courts generally "seek to avoid windfalls" when determining damages.  Id. at 6-7 (citing Endo Pharmaceuticals, Inc. v. Actavis, Inc., 746 F.3d 1371, 1377 (Fed. Cir. 2014), and Lary v. U.S. Postal Service, 472 F.3d 1363, 1369-70 (Fed. Cir. 2006)).  Defendant argues that, given the court's ruling at the motion to dismiss stage that Congress eliminated the 2013 maintenance fee requirement for pre-1993 claimants, plaintiff (and/or its lessee) should have instead been "required . . . to perform assessment work" on any pre-1993 unpatented nonplacer claims as well as comply with the annual filing requirements under the FLPMA, 43 U.S.C. § 1744.  Id. at 7.  According to defendant, plaintiff would receive a windfall if it recovered the 2013 maintenance fees because it would not have had to pay claim maintenance fees, perform assessment work, or complete any FLPMA filings for 2013.

The text of 30 U.S.C. § 28f states that the maintenance fees for unpatented nonplacer claims "shall be in lieu of" the annual assessment work and related filing requirements.  See 30 U.S.C. § 28f(a)(1).  Under the FLPMA, 43 U.S.C. § 1744(a), holders of unpatented nonplacer claims are to file "either a notice of intention to hold the mining claim," "an affidavit of

assessment work performed" on each claim, or "a detailed report provided by [30 U.S.C. § 28-1]." Therefore, defendant suggests that if the claim maintenance fee provision did not apply to pre-1993 claimants, then there would have been a reversion to the pre-1993 status quo—i.e., holders of pre-1993 unpatented nonplacer claims would have been required to engage in assessment work on their claims and comply with the FLPMA filing requirements. The assessment work and the FLPMA filing requirements are "statutory" and thus "not curable," according to defendant, "such that failure to comply with those requirements results in forfeiture by operation of law." Def.'s Mot. 8 (referencing United States v. Locke, 471 U.S. 84, 98-100 (1985), and N.T.M., Inc., 128 I.B.L.A. 77, 79 (1993)). In other words, defendant asserts that if the 2013 maintenance fees are refunded, plaintiff would be at risk of its claims being forfeited because it neither performed assessment work on its claims nor complied with the FLPMA filing requirements for the 2013 assessment year.[12] Id. at 7-8.

### 1. The Anti-Windfall Doctrine Is Not Relevant to the Facts of This Case

Plaintiff contends that the two decisions on which defendant relies—Endo Pharmaceuticals and Lary—provide "no support" for defendant's argument that courts generally seek to avoid windfalls. Pl.'s Resp. to Def.'s Mot. & Reply in Supp. of Pl.'s Mot. ("Pl.'s Reply") 3. Specifically, plaintiff argues that the discussion regarding windfalls in these decisions is merely "irrelevant dicta." Id. Plaintiff also refers to several illegal exaction decisions in the tax context that contained rulings in favor of taxpayers despite creating a windfall. Id. For example, plaintiff references Pennoni v. United States, a decision in which the United States Court of Federal Claims ("Court of Federal Claims") noted that the Internal Revenue Service ("IRS") has been ordered to return money to a taxpayer "even where the courts have recognized that this results in a windfall to the taxpayer." 79 Fed. Cl. 552, 562 (2007). Plaintiff also references Stanley v. United States, in which the Federal Circuit "recognize[d] that the taxpayer . . . will receive a windfall," but nonetheless ordered the money returned. 140 F.3d 1023, 1024-25 (Fed. Cir. 1998); see also O'Bryant v. United States, 49 F.3d 340, 346 (7th Cir. 1995) (allowing plaintiffs a windfall because the IRS failed to follow proper collection procedures).

---

[12] In its cross-motion for summary judgment, defendant raises its "windfall" argument as one of two reasons (in addition to its voluntary payment argument) for why the court should rule in its favor. During oral argument, however, defendant asserted that the "court really doesn't need to reach the windfall issue"; rather, the court could award plaintiff a refund of the 2013 maintenance fees, and leave the issue of whether plaintiff's unpatented nonplacer claims are voided by the refund to be resolved during whatever proceedings might arise in another court. Tr. Oral Arg. (May 28, 2015) at 27. However, because defendant raises its anti-windfall argument in its cross-motion for summary judgment, the court must address it. Nevertheless, as discussed below, see infra Part II.B.2.b, a determination as to the validity or potential forfeiture of plaintiff's mining claims in light of today's ruling is beyond the scope of this action, which solely relates to plaintiff's monetary claim for recoupment of the 2013 maintenance fees.

Assuming, without deciding, the validity of defendant's characterization of plaintiff's recoupment of the 2013 maintenance fees as a windfall,[13] defendant is incorrect that plaintiff's recovery should be barred under the anti-windfall doctrine.  The decisions that defendant relies upon to support its windfall theory involve far different situations than the instant case.  First, in Endo Pharmaceuticals, the Federal Circuit described an earlier case in which it had limited the scope of an implied license "[t]o avoid a windfall to the licensee" because the plaintiff had asserted patent claims that "were broader than the licensed claims."  746 F.3d at 1377 (citing TransCore, LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271, 1279 (Fed. Cir. 2009)).  Second, in Lary, in which the United States Postal Service breached the terms of a settlement agreement with a former employee, the Federal Circuit remanded the case with instructions describing how to avoid overcompensating the employee to avoid a windfall.  472 F.3d at 1369-70.  Defendant's efforts to analogize these two cases to plaintiff's claim fails because plaintiff is neither asserting any sort of overbroad claim nor seeking breach-of-contract damages.  Instead, plaintiff is asserting an illegal exaction claim, arguing that the BLM exceeded its statutory authority by requiring plaintiff to pay 2013 maintenance fees for its pre-1993 unpatented nonplacer claims.

To the extent that there are relevant precedents concerning windfalls in this context, the case law actually favors plaintiff's position.  For example, in Pennoni, the Court of Federal Claims determined that the IRS had used impermissible means to recoup an erroneous refund it had granted to a taxpayer.  79 Fed. Cl. at 561-62.  In lieu of following the appropriate statutory procedures of either filing suit against the taxpayer or reassessing the taxpayer's liability, the IRS recouped the erroneous refund through levy and wage garnishments.  Id.  Although both plaintiff and the government describe Pennoni as a "tax case," the Pennoni court framed the case as an "illegal exaction" claim since the exaction was "directly caused by a misapplication of a statute" and "the remedy implicit in the statute [was] the return of the funds."  Id. at 561 (relying on Norman v. United States, 429 F.3d 1081, 1095-96 (Fed. Cir. 2005)).  The court ordered the government to return the refund it had recouped—even though the refund was originally erroneous—to the taxpayer despite the fact that "this results in a windfall to the taxpayer."  Id. at 562.  In support of its holding, the court in Pennoni noted that the Federal Circuit (as well as another circuit) had previously ordered refunds to taxpayers in similar illegal exaction cases despite the fact that it would result in a windfall.  Id. (referencing Stanley, 140 F.3d at 1024-25, and O'Bryant, 49 F.3d at 346).  These "erroneous refund" precedents demonstrate that when the government acts beyond the statutory authority granted by Congress, it is appropriate to allow a claimant to recoup its money regardless of the potential for a windfall.

---

[13]  It is far from clear that "windfall" is the proper term to describe plaintiff's recoupment of the 2013 maintenance fees.  As traditionally understood, "windfall" denotes some form of "unanticipated benefit" received as the result of a fortuitous event.  See Windfall, Black's Law Dictionary (10th ed. 2014) (defining windfall as "[a]n unanticipated benefit, [usually] in the form of a profit and not caused by the recipient"); Windfall, Webster's II New College Dictionary (2001) (defining windfall as a "sudden, unexpected piece of good luck or unanticipated personal gain").  Plaintiff is not seeking a turn of luck or unexpected profit, but rather is attempting to recoup fees that it argues were never owed in the first place.

Defendant attempts to distinguish the "erroneous refund" line of cases from the case at bar by arguing that in the former, the windfall accrued to the taxpayers because of the government's error, whereas in the present action, the windfall would result from the plaintiff's error in "not following the correct procedure" of "performing assessment work and making [FLPMA] filings" in the event that the 2013 maintenance fees are refunded.  Def.'s Reply to Cross-Mot. for Summ. J. 2.  This attempted distinction is unpersuasive, however, because the possibility of a windfall in this situation stems from the BLM's error in continuing to impermissibly require payment of the 2013 maintenance fees despite a change in the statutory language eliminating such fees.  Indeed, plaintiff's claim is actually stronger than the claims in the "erroneous refund" line of cases because, in those cases, the courts explicitly acknowledged that the taxpayers were recouping refunds to which they were not originally entitled, thereby making their recoveries true windfalls.  See, e.g., Stanley, 140 F.3d at 1027 ("The Government properly describes this case as one of 'computer-generated blunders that rendered [Stanley] the fortuitous beneficiary of a substantial windfall.'" (alteration in original)); O'Bryant, 49 F.3d at 346 (recognizing that "it may seem unjust" that the government could not recover the erroneous refund in light of the "windfall" to the plaintiff).  Here, however, plaintiff seeks to recoup money paid to the government that was collected contrary to law, i.e., that was never owed in the first place.  Accordingly, the court declines to apply the anti-windfall doctrine in this case.

## 2.  Plaintiff's Recovery Would Not Create a Windfall

Assuming, however, that that anti-windfall doctrine was applicable here, defendant has not established that plaintiff's recovery of the 2013 maintenance fees would constitute a windfall under the relevant statutes and regulations.

### a.  No Assessment Work or FLPMA Filings Was Required

As noted above, defendant's windfall argument presumes that in the event the maintenance fees are refunded there should be a reversion to the pre-1993 status quo, which requires assessment work and FLPMA filings in order for claim holders to retain their claims. Defendant bases this argument on the text of 30 U.S.C. § 28f, which states that the maintenance fees are "in lieu of" the assessment work and FLPMA filing requirements.  It is not clear, however, that defendant is correct in suggesting that plaintiff should have engaged in assessment work and completed the FLPMA filings.  For example, 30 U.S.C. § 28f could be read as entirely supplanting previously codified mining laws, including the FLPMA and the Mining Law of 1872.  See, e.g., Kunkes v. United States, 78 F.3d 1549, 1550 (Fed. Cir. 1996) (explaining that the new maintenance fee requirement had "replaced" the prior assessment work requirement). In fact, under current law, it appears that claimants are not required to complete assessment work or FLPMA filings unless they are granted a small miner exemption from the maintenance fee requirement, see Jones v. United States, 121 F.3d 1327, 1329 (9th Cir. 1997), which can be seen by comparing the pre-1993 and post-1993 statutory language of 30 U.S.C. § 28.  Before the passage of the 1993 Act, 30 U.S.C. § 28 described the assessment work requirement as follows:

> On each claim located after the 10th day of May 1872, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year.

30 U.S.C. § 28 (1988).  The 1993 Act modified the assessment work requirement:

> On each claim located after the 10th day of May 1872, <u>that is granted a waiver under section 28f of this title</u>, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year.

30 U.S.C. § 28 (1994) (emphasis added) (codifying the 1993 Act, § 10105(b), 107 Stat. at 406-07).

During oral argument, defendant asserted that, under this reading of the statute, the law now lacks harmony because 30 U.S.C. § 28 states that only those claim holders that receive a waiver must conduct assessment work, while 30 U.S.C. § 28f states that the maintenance fees are "in lieu of" assessment work.  Tr. Oral Arg. (May 28, 2015) at 25.  In other words, defendant suggests that it only makes sense for Congress to say that the maintenance fees are "in lieu of" assessment work if assessment work was required under the statute, and thus if Congress really meant to remove the maintenance fee requirement for pre-1993 claimants, it would have made a corresponding change to the assessment work waiver provision.

Although defendant's argument that Congress did not intend to change the maintenance fee requirements for pre-1993 claimants given that it did not amend other corresponding parts of the statute at the same time is plausible, it is not dispositive.  It is equally plausible that Congress intended to do exactly what it did—remove the maintenance fee requirement for pre-1993 claimants while also retaining the provision that only required assessment work if claim holders received a waiver from paying the maintenance fees.  As the court held at the motion to dismiss stage, a "'plain, nonabsurd meaning'" of a statute should prevail, and thus the deletion of the word "before" from 30 U.S.C. § 28f in the 2012 Act is best interpreted as eliminating the maintenance fee requirement for pre-1993 claimants.  <u>Silver Buckle</u>, 117 Fed. Cl. at 793 (quoting <u>Lamie v. U.S. Tr.</u>, 540 U.S. 526, 538 (2004)).  Moreover, that the court's interpretation may arguably create dissonance between different parts of the statute does not obviate the clear and specific language of 30 U.S.C. § 28f following the passage of the 2012 Act.  <u>See Morales v. Trans World Airlines, Inc.</u>, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general . . . ."); <u>U.S. R.R. Ret. Bd. v. Fritz</u>, 449 U.S. 166, 179 (1980) ("The language of the statute is clear, and we have historically assumed that Congress intended what it enacted.").

Other judges of this court have determined that the 1993 Act's amendments to 30 U.S.C. §§ 28-28*l*, which substituted the maintenance fee requirement for the assessment work requirement, also obviated the filing requirements under the FLPMA.  <u>See, e.g.</u>, <u>Saltzman v. United States</u>, No. 13-1014L, 2014 WL 4050181, at *2 (Fed. Cl. Aug. 15, 2014) (unreported order) ("Since 1993, mining claimants have been required to pay an annual fee to hold their mining claims in lieu of the assessment work requirement of the Mining Law <u>and the annual filing requirements of [the FLPMA]</u>, 43 U.S.C. § 1744." (emphasis added)); <u>Kunkes v. United States</u>, 32 Fed. Cl. 249, 251 (1994) (indicating that the 1993 Act "suspended the obligations specified in both the Mining Act and the FLPMA"); <u>accord</u> 43 C.F.R. § 3834.11(a) ("Paying the maintenance fee(s) . . . satisfies the requirements of the mining law and FLPMA.").

Decisions by the Interior Board of Land Appeals ("IBLA") have been even more explicit in describing the current requirements under federal mining laws for unpatented nonplacer claim holders. In McCarty, the IBLA stated that "[t]he cardinal rule is that for each and every assessment year, either (1) maintenance fees must be paid, or (2) a small miner waiver certification must be filed and assessment work performed and documented." 181 I.B.L.A. 224, 226 (2011). If a claim holder does not qualify for a waiver, then it must pay the required maintenance fees or face the possibility of claim abandonment. See Wray, 129 I.B.L.A. 173, 175 (1994) ("Where a mining claimant fails to qualify for a small miner exemption from the [maintenance] fee requirement, failure to pay the fee in accordance with the Act and regulations results in a conclusive presumption of abandonment."); accord Strubel v. United States, No. 06-112C, 2009 WL 1636355, at *4-5 (Fed. Cl. June 10, 2009) (unreported opinion) ("An annual maintenance fee . . . is now required in lieu of assessment work and its associated filing . . . . Failure to pay the maintenance fee, or to submit a fee waiver certification . . . , results in the forfeiture of the unpatented mining claim."). In other words, claim holders are not given a choice to either pay maintenance fees or complete assessment work and file the requisite FLPMA paperwork; rather, all nonexempt claim holders must pay maintenance fees. See Perry, 131 I.B.L.A. 1, 4 (1994) ("Compliance with the [FLPMA] filing requirement, however, does not affect the requirement to pay annual [maintenance fees] or excuse appellant's failure to pay, although payment of the fee obviates compliance with the assessment work requirement.").

The applicable regulations further demonstrate that FLPMA filing requirements only apply in cases where a claim holder has obtained a waiver from paying maintenance fees. As plaintiff points out, the section of the regulations containing the FLPMA's notice of intent requirement is titled "Part 3835—Waivers From Annual Maintenance Fees." 43 C.F.R. pt. 3835. Therefore, the regulations clearly contemplate completion of FLPMA filings only in situations where a claim holder received a waiver from the maintenance fee requirement. Id. To obtain such a waiver, a claim holder would have to be a small miner (holding ten mining claims or less), military personnel on active duty status, the holder of a mining site undergoing reclamation, a miner denied access to its claims by the National Park Service, or a claim holder applying for a mineral patent. Id. § 3835.1. None of these classifications is applicable to plaintiff.

Furthermore, 43 C.F.R. § 3835.31(d) specifically lists the different situations in which claim holders are required to file a notice of intent to hold their claims once a waiver has been obtained. A notice of intent to hold is only required when the claim holder has (1) an oil shale placer claim; (2) a small miner waiver that covers mining claims, and either the claim was located during the current assessment year or the BLM deferred the assessment work; (3) a small miner waiver that covers mill or tunnel sites; (4) a waiver due to the claim undergoing reclamation work or having been denied access; or (5) received an assessment work deferral. Id. Again, none of these situations applies to plaintiff. Id. § 3835.31(d). Even assuming, without deciding, that a refund of the 2013 maintenance fees could be construed as a "waiver" in the broadest sense of the word, it would clearly fall outside the scope of 43 C.F.R. § 3835.31(d). In addition, this regulation expressly indicates that if a claim holder has "paid annual maintenance fees," then it is not required to complete either a notice of intent to hold or an assessment work

affidavit.[14]  Id.  Since plaintiff paid the 2013 maintenance fees (through its lessee), it appears that, under the regulation, no assessment work or FLPMA filings were necessary.  Refunding the 2013 maintenance fees does not retroactively change the fact that the fees were initially paid.

**b.  Plaintiff Is Not Likely Subject to Claim Forfeiture, but That Issue Is Beyond the Scope of This Case**

Defendant argues that plaintiff could potentially face forfeiture of its pre-1993 unpatented nonplacer claims in the event the 2013 maintenance fees are recouped and it is found that plaintiff should have engaged in assessment work and completed the FLPMA filings.  However, the statutory and regulatory framework discussed above seems to suggest that plaintiff was not required to complete assessment work or submit any FLPMA filings in the absence of a maintenance fee waiver.  Further, 30 U.S.C. § 28i provides for claim forfeiture only when fees "as required" by section 28f (and other sections not relevant to the case at bar) are not paid.  Therefore, it appears that claim forfeiture under section 28i would be inapplicable to plaintiff because the 2013 maintenance fees were not required for pre-1993 claimants under the 2012 Act.  It also appears that claim forfeiture under 43 U.S.C. § 1744(c) for failure to effect FLPMA filings would be inapplicable to plaintiff because there was no requirement to make such filings under 43 C.F.R. §§ 3835.12, .30 since no waiver was in place and there was no assessment work requirement or deferral.  Even absent these provisions, section 28f characterizes the FLPMA filing requirements in 43 U.S.C. § 1744 as being "related" to the assessment work requirement contained in section 28, demonstrating that the FLPMA filings are not required (and thus there could be no claim forfeiture due to their nonfiling) unless assessment work is required (which, as explained previously, it was not).

However, a finding as to whether plaintiff faces a risk of forfeiture on its mining claims is beyond the scope of this case and the court's jurisdiction.  As the court determined when it denied defendant's motion to dismiss, plaintiff's action seeking recovery of the 2013 maintenance fees is an illegal exaction claim that is clearly within this court's jurisdiction.  Silver Buckle, 117 Fed. Cl. at 791; accord Aerolineas Argentinas, 77 F.3d at 1573 ("The Tucker Act

---

[14]  The parties expend significant energy disputing whether or not plaintiff (and other putative plaintiffs) constructively complied with the FLPMA's notice of intent requirements by virtue of the forms they sent to the BLM accompanying payment of their 2013 maintenance fees.  See generally Def.'s Supp'l Br.; Pl.'s Mot. Class Cert.  Defendant argues that a proper notice of intent requires two steps.  Def.'s Supp'l Br. 1-2.  First, the owner of a mining claim must file a valid notice of intent "in the office where the location notice or certificate is recorded," 43 U.S.C. § 1744(a), which is typically the local county recorder's office, see 43 C.F.R. § 3830.5 ("Local recording office means the county or state government office established under state law where you are usually required to record all legal documents including, but not limited to, deeds and wills.").  Second, the owner of a mining claim must also file "a copy [of the notice of intent]" with the BLM.  Def.'s Supp'l Br. 1 (citing 43 U.S.C. § 1744(a)(2)).  A letter that merely "evidence[s] a 'continual interest' in the claims" is not an adequate notice of intent under the FLPMA.  Red Top Mercury Mines, Inc. v. United States, 887 F.2d 198, 205 (9th Cir. 1989).  In any event, the court need not reach the issue of the proper format of a notice of intent because, as discussed above, a notice of intent was not required.

provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power."). The issue of whether or not plaintiff's mining claims are subject to forfeiture, however, is not "incident of and collateral to" plaintiff's claim for monetary damages against the United States. See 28 U.S.C. § 1491(a)(2) (2012); accord James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998) ("[T]he Court of Federal Claims has no power to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment." (internal quotation marks omitted)); Austin v. United States, 206 Ct. Cl. 719, 723 (1975) ("[W]e have no authority to enter a declaratory judgment, or to grant affirmative non-monetary relief unless it is tied and subordinate to a monetary award."). Because the court is able to resolve the issue of whether plaintiff is entitled to recover the 2013 maintenance fees without having to resolve the additional issue of claim forfeiture, it is clear that the forfeiture issue is not "tied and subordinate to" a money judgment in this case. Thus, any decision regarding claim forfeiture would be premature until and unless such purported forfeiture actually occurred.[15] James, 159 Fed. Cl. at 580.

### 3. Conclusion

In sum, plaintiff is entitled to recover all 2013 maintenance fees paid because the anti-windfall doctrine does not apply to this case. In the alternative, assuming that the anti-windfall doctrine applies to this case, plaintiff would still be entitled to recover all 2013 maintenance fees paid because no assessment work or related FLPMA filings were required. In other words, plaintiff would not receive a windfall. But, to the extent that there would be such a windfall, it is permissible because it results from payments made pursuant to regulations promulgated in violation of the BLM's statutory authority as conferred by Congress. In any event, the court need not, and cannot, reach the issue of whether plaintiff faces potential forfeiture of its claims on account of not engaging in assessment work or completing FLPMA filings for the 2013 assessment year.

---

[15] A determination as to the validity or potential forfeiture of plaintiff's mining claims appears to be an issue for the DOI to address in the first instance. See Reoforce, Inc. v. United States, 119 Fed. Cl. 1, 8 (2013) ("The Department of the Interior is the most eligible voice to pronounce upon the validity of mining claims, however judicial review is available in district court pursuant to the Administrative Procedure Act. This Court generally does not entertain such a review, and where appropriate, stays such cases so that the decision can be referred to the BLM." (citations omitted)); Hafen v. United States, 30 Fed. Cl. 470, 473 (1994) ("The determination of the validity of [mining] claims against the public lands has been entrusted to the Department of the Interior since its creation in 1849."). Furthermore, it is unlikely that the Court of Federal Claims would be the appropriate forum for judicial review of an agency decision regarding forfeiture of plaintiff's claims. See Aulston v. United States, 823 F.2d 510, 514 (Fed. Cir. 1987) ( "[W]here the administrative agencies of the Interior Department have decided that the United States (not the claimants) own[s] the disputed property, the [Court of Federal Claims] could not review or overturn that administrative determination even though [the] court indisputably had jurisdiction over 'taking' claims. The authority to review Interior's administrative decision lay initially in the district courts . . . .").

### III.  MOTION FOR CLASS CERTIFICATION

Having concluded that plaintiff is entitled to recover the 2013 maintenance fees that were paid, the court turns to plaintiff's motion for class certification.  Class action lawsuits are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979), quoted in Wal-Mart Stores, Inc. v. Duke, 564 U.S. 338, 348 (2011).  RCFC 23 governs class action suits in the Court of Federal Claims.[16]  In seeking class certification, parties must "affirmatively demonstrate" compliance with this rule.  Wal-Mart, 564 U.S. at 350.  RCFC 23 provides:

> **(a) Prerequisites.**  One or more members of a class may sue as representative parties on behalf of all members only if:
>
> > **(1)** the class is so numerous that joinder of all members is impracticable;
> >
> > **(2)** there are questions of law or fact common to the class;
> >
> > **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > **(4)** the representative parties will fairly and adequately protect the interests of the class.
>
> **(b) Class Actions Maintainable.**  A class action may be maintained if RCFC 23(a) is satisfied and if:
>
> > **(1)** [not used];
> >
> > **(2)** the United States has acted or refused to act on grounds generally applicable to the class; and
> >
> > **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

---

[16]  RCFC 23 is patterned after Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), with the notable exception that RCFC 23 allows only opt-in class actions.  See Curry v. United States, 81 Fed. Cl. 328, 331-32 (2008).  Because of this similarity, case law analyzing FRCP 23 may be used to construe RCFC 23.  Id. at 332 n.10.

> **(A)** the class members' interests in individually controlling the prosecution of separate actions;
>
> **(B)** the extent and nature of any litigation concerning the controversy already begun by class members;
>
> **(C)** [not used]; and
>
> **(D)** the likely difficulties in managing a class action.

RCFC 23(a)-(b).  The court must conduct a "rigorous analysis" to determine whether the requirements for class certification have been met.  Wal-Mart, 564 U.S. at 350-51 (internal quotation marks omitted).  These requirements have been conveniently restated as comprising five elements:  (1) numerosity, (2) commonality, (3) typicality, (4) adequacy, and (5) superiority.  King v. United States, 84 Fed. Cl. 120, 123 (2008) (citing Barnes v. United States, 68 Fed. Cl. 492, 494 (2005)).  To prevail in their motion to certify a class, plaintiffs must establish that their proposed class action satisfies each of the five elements by a preponderance of the evidence.  Id. For the purpose of determining whether a class action should be certified, the court assumes that the factual assertions contained in the complaint are true.  Barnes, 68 Fed. Cl. at 495 (citing E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 405-06 (1977)).

Plaintiff alleges in its complaint that its illegal exaction claim is appropriate for a class action.  In its motion for class certification, plaintiff defines the proposed class and argues that its class action satisfies the RCFC 23 requirements of numerosity, commonality, typicality, adequacy, and superiority.  Each of these issues will be addressed in turn.

## A. Definition of the Proposed Class

Plaintiff defines its proposed class as follows:

> Each and every holder of an unpatented lode mining claim, or unpatented mill site, or unpatented tunnel site located pursuant to the mining laws of the United States prior to August [10], 1993 who either paid to the United States Secretary of the Interior a claim maintenance fee for such claim or site for assessment year 2013 by paying the fee on or before September 1, 2012, or by assignment, holds the right to recover such payment.[17]

Pl.'s Mot. Class Cert. 7 (footnote added).  Defendant argues that plaintiff's class definition is improper because it "includes purported class members who are not real parties in interest, and will lead to double recovery" of the maintenance fee.  Def.'s Resp. to Pl.'s Mot. for Class Cert.

---

[17]  Plaintiff erroneously used the date of "August 9, 1993" in its proposed class definition.  See 2012 Act, § 430, 125 Stat. at 1047 (codified as amended at 30 U.S.C. § 28f(a)).

("Def.'s Opp'n to Class Cert.") 6. According to defendant, plaintiff's use of the phrase "[e]ach and every" in its class definition will capture "both companies that paid the 2013 maintenance fee, and those that hold the right to recover such payment by assignment." Id.

Defendant's concern is misplaced. The final disjunctive "or" in the definition of plaintiff's proposed class differentiates between claim holders that paid the 2013 maintenance fee directly and those that hold the right to recover such payment; the definition in its entirety indicates that, if applicable, the latter replaces the former as a potential class member. In other words, as plaintiff emphasizes in reply, only one recovery per claim is available.

Nevertheless, defendant asserts that a disjunctive interpretation would still "require a unique factual determination regarding who is the real party in interest," thus undermining the appropriateness of maintaining a class action. Id. at 6-7. With respect to the 2013 maintenance fees, the real party in interest regarding a particular claim is the claim holder.[18] Claim holders— not lessees or agents—are ultimately obliged because the applicable regulations place responsibility for paying the claim maintenance fees on the "claim holder." See generally Administration of Mining Claims and Sites, 77 Fed. Reg. at 44,155-58. This directive is grounded in the text of section 28f itself, which states the "holder of each . . . claim" must pay the maintenance fees. 30 U.S.C. § 28f(a) (emphasis added). Since the BLM requires each claim holder to pay the annual maintenance fees or risk forfeiture of the claim, the claim holder is the party entitled to recover against defendant. A private agreement between a claim holder and a lessee or an agent, including any assignment of rights to recover the 2013 maintenance fees paid, is beyond the jurisdiction of this court.[19] See Delmarva Power & Light Co. v. United States, 79 Fed. Cl. 205, 213 (2007) ("The Court of Federal Claims was established to provide a forum for the vindication of public rights, i.e., to provide a mechanism for holding government accountable to suits by private citizens. The court lacks jurisdiction over private rights implicated in a dispute between private parties."); see also 31 U.S.C. § 3727(b) (prohibiting the assignment of claims against the United States until the "claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued"). Therefore, the court modifies plaintiff's definition of the proposed class as follows:

---

[18] Many claims have multiple owners. See, e.g., 43 C.F.R. § 3830.5 (defining a claimant as the party "who is the owner of all or any part of an unpatented mining claim or site" (emphasis added)). For those claims, the total recovery would be ratably apportioned among the owners.

[19] The Court of Federal Claims has "historically taken jurisdiction to decide a dispute between private parties [only] if resolution of that dispute bears on a monetary claim against the government." Am. Renovation & Constr. Co. v. United States, 65 Fed. Cl. 254, 260 (2005). However, the court typically does so only when exercising "ancillary jurisdiction" over certain intervenor claims, see, e.g., M.E.S., Inc. v. United States, 104 Fed. Cl. 620, 627 (2012), or in certain patent infringement disputes involving a government contractor under 28 U.S.C. § 1498(a), see, e.g., Advanced Software Design Corp. v. Fed. Reserve Bank of St. Louis, 583 F.3d 1371, 1375-76 (Fed. Cir. 2009). Ultimately, however, the general principle that the Court of Federal Claims "does not have subject matter jurisdiction to entertain controversies between private parties," Hufford v. United States, 85 Fed. Cl. 607, 608 (2009), applies in this case.

> With respect to an unpatented lode mining claim, unpatented mill site, or unpatented tunnel site located pursuant to the mining laws of the United States prior to August 10, 1993, for which a claim maintenance fee for such claim or site for assessment year 2013 was timely paid to the United States Secretary of the Interior on or before September 1, 2012, each and every person who, at the time of such payment, was the holder of all or any part of such claim or site, unless a waiver under 30 U.S.C. § 28f(d) pertaining to the claim or site was in place for assessment year 2013.

See King, 84 Fed. Cl. at 128-29 (granting a motion to certify a class but modifying substantive and nonsubstantive aspects of the plaintiff's proposed class definition to remove its flaws).

Under this revised definition of the proposed class, only those claimants who were claim holders when the 2013 maintenance fees were paid are entitled to recover, whether or not they still hold the claims.[20] Further, current or former claim holders who did not pay the 2013 maintenance fees, whether because they did not hold the claims in 2012 or simply failed to pay the fees, are excluded from the class. This class definition prevents a double recovery regarding any particular claim by ensuring that only those who were legally responsible for paying the 2013 maintenance fees, for which claims those fees were actually paid, are entitled to recover.[21]

### B. Numerosity

The first requirement of a class action is numerosity. A class must be "so large that joinder is impracticable." Barnes, 68 Fed. Cl. at 494; accord RCFC 23(a)(1). In other words, a putative class representative must establish that "it is extremely difficult or inconvenient to join all the members of the class." Jaynes v. United States, 69 Fed. Cl. 450, 454 (2006) (internal quotation marks omitted). In evaluating numerosity, courts consider the number of potential class members, the geographic dispersal of the potential class members, and the size of each potential class member's claim. King, 84 Fed. Cl. at 123-24. The number of potential class members is the most important factor. Id. at 124; see also Jaynes, 69 Fed. Cl. at 454 (describing the number of class members as "central" to the numerosity inquiry).

Plaintiff estimates that "the putative class consists of tens of thousands of members." Pl.'s Mot. Class Cert. 7. Accordingly, defendant is "not contesting numerosity." Id. However, the court must "nonetheless independently find that the plaintiff has satisfied [an uncontested] requirement" of the certification analysis. Bell v. United States, 123 Fed. Cl. 390, 402 (2015) (internal quotation marks omitted).

---

[20] Claims for which a small miner waiver under 30 U.S.C. § 28f(d) was in place are excepted. In such cases, the payment would have been truly voluntary and thus unrecoverable.

[21] The court's modification of plaintiff's proposed class definition does not preclude either party from moving to amend the class definition if it believes that another definition is more appropriate.

Plaintiff's estimate appears reasonable.  For example, the BLM reports having "processed maintenance fee payments for 375,958 [existing] claims and sites" in addition to "record[ing] 58,775 new claims and sites" during the 2011 fiscal year (the year prior to the one in which the 2013 maintenance fee payments were collected).  Administration of Mining Claims and Sites, 77 Fed. Reg. at 44,155.  Further, pursuant to Rule 201 of the Federal Rules of Evidence, the court takes judicial notice of the fact that, according to BLM estimates, there were 406,140 active mining claims as of September 30, 2012.  Bureau of Land Mgmt., U.S. Dept. of the Interior, Public Land Statistics 2012, at 141 (June 2013), https://www.blm.gov/public_land_statistics/pls12/pls2012-web.pdf.  The court recognizes that these BLM figures overstate the size of the potential class because they include both unpatented nonplacer claims (which are at issue) and unpatented placer claims (which are not at issue).  In fact, based on discovery responses, there appear to be "approximately 69,000 claims."  Pl.'s Mot. Class Cert. 13.  The sheer volume of potential class members in this case is sufficient to satisfy the court that, as the parties indicate, the proposed class easily satisfies the numerosity requirement.

## C. Commonality

The next requirement is commonality, which specifies that class members must "have suffered the same injury" such that "all their claims can be productively litigated at once."  Wal-Mart, 564 U.S. at 350.  In other words, commonality involves not simply the "raising of common questions," but rather the ability "to generate common answers apt to drive the resolution of the litigation."  Id. (internal quotation marks omitted).  The commonality requirement entails an evaluation of the "common questions of law or fact, the predominance of those questions, and the treatment received by the class members [from the federal government]."  Barnes, 68 Fed. Cl. at 494; accord RCFC 23(a)(2), (b)(2)-(3).  Here, defendant does not appear to contest commonality.

## 1. Common Issues

To establish the existence of a common legal or factual issue, RCFC 23(a)(2), plaintiff must demonstrate that the claims of potential class members "depend upon a common contention" that is "capable of classwide resolution."  Wal-Mart, 564 U.S. at 350; see also King, 84 Fed. Cl. at 126 (agreeing that "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members" (internal quotation marks omitted)); Barnes, 68 Fed. Cl. at 496 ("[T]he questions underlying the claims of the class merely must share essential characteristics, so that their resolution will advance the overall case.").  A common contention can be resolved for the entire class if the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Wal-Mart, 564 U.S. at 350; accord Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) ("[A] common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." (internal quotation marks omitted)).  Only one significant common contention capable of classwide resolution is necessary to satisfy the common-issue requirement.  See Barnes, 68 Fed. Cl. at 496 n.6.

In this case, plaintiff argues that its illegal exaction claim "involves one central question common to each member of the putative class—did [the BLM] illegally exact annual maintenance fees for assessment year 2013" from pre-1993 claimants? Pl.'s Mot. Class Cert. 1. While the central legal question has already been answered in this case (and in the affirmative), see supra Part II, the proper inquiry is not whether legal questions have already been answered, but rather the extent to which such answers (whenever they come) will facilitate resolution of the entire matter. Cf. Wal-Mart, 564 U.S. at 350 (explaining that the common issue must be "capable of classwide resolution" (emphasis added)). Here, the common-issue requirement is easily satisfied. An identical legal question is present for each potential class member—i.e., whether the government is required to refund paid 2013 maintenance fees. Further, even if the answer to that question was not yet known, the question is outcome-determinative since it can be answered on a classwide basis and allows the entire matter to be resolved "in one stroke." Id.

## 2.  Predominance

Having established the existence of a common legal issue, the court must next determine whether that issue predominates over issues that are not common to the proposed class. RCFC 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and is "far more demanding" than the initial common-issue inquiry. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997); accord Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013). Common issues are those in which the same evidence could be used by each class member to make a prima facie showing, whereas individual issues are those in which each member of the class must present individualized evidence to make a prima facie showing. Jaynes, 69 Fed. Cl. at 457. Common issues predominate over individual issues if the common issues "that can be resolved by generalized proof are more substantial than the issues subject only to individualized proof." Id. (internal quotation marks omitted); accord Barnes, 68 Fed. Cl. at 496.

Plaintiff asserts that "[n]o individual issues have been raised by any class member" and notes that "no other litigation on behalf of any class member has been filed." Pl.'s Mot. Class Cert. 8. According to plaintiff, these facts demonstrate that "the claims of class members share the same essential characteristics so that resolution . . . can be accomplished by generalized proof." Id. While defendant raises concerns about the predominance of common issues over individual issues, those concerns have either been obviated by the court's summary judgment ruling or are more appropriately addressed under the adequacy prong. The court agrees with plaintiff that resolution of this case involves generalized proof, i.e., one central legal question. In fact, there does not appear to be any individualized legal or factual issues involved in this action, other than the straightforward determination of whether a particular claimant qualifies as a member of the class. To the extent that there are any individualized issues, they will be resolved via the opt-in process.

## 3.  Similar Treatment

The final aspect of the commonality requirement is determining whether the government has "acted or refused to act on grounds generally applicable to the class." RCFC 23(b)(2). Plaintiff contends that the BLM "accomplished an illegal exaction by taking the maintenance fee

from each putative class member." Pl.'s Mot. Class Cert. 8. While defendant disagrees that the BLM effected an illegal exaction, defendant does not dispute plaintiff's assertion of similar treatment.

The BLM regulation specifying the 2013 maintenance fees applied to all holders of unpatented nonplacer claims. See Administration of Mining Claims and Sites, 77 Fed. Reg. at 44,158. Each pre-1993 claimant was thus required to make payment. The proposed class is a subset of this group—by definition, the proposed class is limited to pre-1993 claimants that paid (directly or indirectly) the 2013 maintenance fees for which there was no small miner waiver in effect. Therefore, the similar treatment aspect is clearly satisfied because each member of the proposed class received identical treatment from the BLM, i.e., being required to pay the 2013 maintenance fees pursuant to 43 C.F.R. 3830.21.

### 4. Conclusion

Plaintiff has satisfied the common issues, predominance, and similar treatment aspects of commonality. Therefore, the commonality requirement for class certification has been met.

### D. Typicality

The third general requirement for maintaining a class action is that the legal claims of the proposed class representative(s) be typical of the claims of the other prospective class members. See RCFC 23(a)(3). The typicality and commonality requirements "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Wal-Mart, 564 U.S. at 349 n.5 (internal quotation marks omitted). Nevertheless, typicality and commonality are distinct requirements.

Typicality is demonstrated "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Barnes, 68 Fed. Cl. at 498 (internal quotation marks omitted); accord King, 84 Fed. Cl. at 126 ("Courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." (internal quotation marks omitted)). In other words, the interests of the class representative must be sufficiently aligned with those of the class such that the "named plaintiff will also advance the interests of the class members" in pursuing its own claims. Barnes, 68 Fed. Cl. at 498 (internal quotation marks omitted). Typicality "may be satisfied even if some factual differences exist between the claims of the named representatives and the claims of the class, provided that the named representatives' claims share the same essential characteristics as the claims of the class at large." Fisher v. United States, 69 Fed. Cl. 193, 200 (2006) (internal quotation marks omitted). Accordingly, "[t]he threshold requirement for typicality is . . . not high." Id.

Here, the legal claims of each potential class member arise from the same course of action: payment of the 2013 maintenance fees. Further, all of the potential class members would

make the same legal argument:  that the BLM regulation requiring those fees, see Administration of Mining Claims and Sites, 77 Fed. Reg. at 44,158, was promulgated contrary to the express terms of the 2012 Act.  The only distinctions between class members are inconsequential.  The damages suffered by individual class members will vary based on the number of pre-1993 unpatented nonplacer claims held and whether those claims constitute full or partial interests.  However, "individualized damage determinations" do not preclude class certification, Barnes, 68 Fed. Cl. at 492, and such differences do not detract from the shared essential characteristics of the potential class members' legal claims.  Accordingly, plaintiff has satisfied the typicality requirement.

### E.  Adequacy

In addition to establishing numerosity, commonality, and typicality, a putative class representative must establish that it will "fairly and adequately protect the interests of the class." RCFC 23(a)(4).  There are two aspects to the adequacy requirement:  (1) the existence of conflicts between the putative class representative and members of the proposed class, and (2) the qualifications and capabilities of proposed class counsel.  Wal-Mart, 564 U.S. at 349 n.5; Amchem Prods., 521 U.S. at 625-26 & n.6; King, 84 Fed. Cl. at 127.

### 1.  Conflicts of Interest

The first component of the adequacy requirement addresses whether there are any conflicts of interest precluding a plaintiff from serving as class representative.  See Amchem Prods., 521 U.S. at 625 ("The adequacy inquiry under [RCFC] 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.").  Class representatives must be "part of the class and possess the same interest and suffer the same injury as the class members."  Id. at 625-26 (internal quotation marks omitted).  In other words, class members "must not have interests that are antagonistic to one another" or to the class representative.  Barnes, 68 Fed. Cl. at 499 (internal quotation marks omitted).

Besides contesting the definition of the proposed class, defendant's chief objection to class certification is that plaintiff, as class representative, will not be able to fairly and adequately protect the interests of all of the putative class members because there is a potential conflict of interest between class members who completed assessment work and the FLPMA filings for the 2013 assessment year, and those who did not.[22]  Defendant argues that putative class members who failed to conduct assessment work and complete the FLPMA filings may "leave nothing securing their pre-1993 [unpatented] nonplacer claims, . . . render[ing] those claims void by operation of law, or at a minimum, at risk of challenge by rival claimants" in the event this suit is

---

[22]  Defendant demonstrates that some claim holders did, in fact, file notices of intention to hold their claims and/or an affidavit attesting to the completion of assessment work pursuant to the FLPMA, while others did not file such paperwork.  Compare Def.'s Opp'n to Class Cert. App. 1-8 (containing filings from a claim holder who paid the requisite maintenance fee but did not file a notice of intent to hold its claims or an assessment work affidavit), with id. at 9-40 (containing filings from claim holders who paid maintenance fees and also filed notices of intent to hold their claims and/or assessment work affidavits).

successful.  Def.'s Opp'n to Class Cert. 5.  According to defendant, such class members would have an interest in not obtaining a refund due to this supposed risk of forfeiture.  On the other hand, defendant argues, any putative class members that performed assessment work and completed the FLPMA filings face "no risk of their claims being voided by operation of law because their 2013 related filings would have secured their pre-1993 [unpatented] nonplacer claims."  Id.  According to defendant, these divergent interests create a potential conflict between certain class members and plaintiff as class representative.

To the extent that defendant's concerns regarding a conflict between plaintiff and certain class members relates to defendant's windfall argument in its summary judgment briefing, those concerns have already been addressed.  See supra Part II.B.  Further, as explained previously, although no assessment work or related FLPMA filings were required, the issue of potential claim forfeiture is not before this court and, in any event, is not necessary for resolution of the instant dispute.

In any event, defendant's concern that a conflict of interest is created by the potential for some class members, but not others, to risk forfeiture of their claims is misplaced.  A potential class member who "has an interest in not obtaining . . . a refund" of the 2013 maintenance fees, Def.'s Opp'n to Class Cert. 2, can simply elect not to participate in the case.  Only one type of class action may be maintained in the Court of Federal Claims—an opt-in class action.  RCFC 23(c)(2)(B)(iv)-(v) & rules committee's notes to 2002 revision; Bright v. United States, 603 F.3d 1273, 1277 & n.1 (Fed. Cir. 2010).  It is well settled that in an opt-in class action, only those parties who affirmatively choose to join the class are bound by the outcome.  See, e.g., Geneva Rock Prods., Inc. v. United States, 100 Fed. Cl. 778, 785-86 (2011); Jaynes, 69 Fed. Cl. at 460.  Accordingly, a party that chooses not to participate in a class action in the Court of Federal Claims does not lose any legal rights as a result of that decision; whatever happens in the class action has no bearing on parties who do not participate.  Thus, it would be impossible for plaintiff's interests in pursuing this suit to diverge from the interests of nonparticipating parties.  Assuming that the notice to potential class members will include a clear statement that the potential for forfeiture of their pre-1993 unpatented nonplacer claims is beyond the scope of this case, there will be no conflicts between members of the opt-in class and plaintiff as class representative.

In sum, the preponderance of the evidence suggests, under the first component of the adequacy requirement, that there is no conflict of interest between plaintiff and the other potential class members.

## 2. Proposed Class Counsel

Besides considering potential conflicts of interest, the adequacy inquiry also encompasses the "competency of class counsel."  Wal-Mart, 564 U.S. at 349 n.5 (internal quotation marks omitted).  Before the court can appoint class counsel, the court "must consider":

> (i)   the work counsel has done in identifying or investigating potential claims in the action;

     (ii)   counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

     (iii)  counsel's knowledge of the applicable law; and

     (iv)  the resources that counsel will commit to representing the class.

RCFC 23(g)(1)(A); accord Jenkins v. United States, 104 Fed. Cl. 641, 646 (2009).  In addition, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  RCFC 23(g)(1)(B).  Ultimately, the court must be satisfied that class counsel is "qualified, experienced, and generally able to conduct the litigation." Barnes, 68 Fed. Cl. at 499 (internal quotation marks omitted).  Although defendant does not challenge the experience or qualifications of plaintiff's counsel, the court must nevertheless satisfy itself that the appointment of plaintiff's counsel as class counsel would be in the best interests of the proposed class.  Cf. RCFC 23(g)(2).

     Plaintiff declares that "[p]roposed class counsel and his law firm have extensive experience in administering class actions" and that the firm "is fully capable of providing the necessary resources and experience to administer the class and conduct this litigation to its conclusion."  Pl.'s Mot. Class Cert. 11.  Plaintiff also attached an affidavit to its motion in which its counsel describes his background litigating class action lawsuits throughout several decades of practicing law, his familiarity with BLM jurisdiction and other mining law matters, and the experience and resources of his firm (which has been in existence for over half a century) to manage the instant case as a class action.  Further, counsel's work in identifying and investigating the salient issues in this case is readily apparent through his participation in this litigation—litigation that has already spanned nearly four years and has included extensive briefing, multiple oral arguments, and successfully defeating defendant's motion to dismiss. Plaintiff also notes that "[t]he present action is primarily an issue of law" and states that "[i]t is not anticipated that factual issues will necessitate a trial."  Id.  Accordingly, there is no reason to doubt that plaintiff's counsel is qualified, experienced, and able to conduct this litigation.

     In sum, a preponderance of the evidence before the court indicates that the appointment of plaintiff's counsel as class counsel would be in the best interests of the proposed class if the case was certified as a class action.

### 3. Conclusion

     Plaintiff has satisfied the conflicts of interest and class counsel aspects of adequacy. Therefore, the adequacy requirement for class certification has been met.

**F. Superiority**

The final requirement that plaintiff must satisfy to maintain a class action is superiority. A class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."[23]  RCFC 23(b)(3).  This requirement is met if the prospective class representative establishes that "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  FRCP 23 advisory committee's note to 1966 amendment, quoted in Amchem Prods., 521 U.S. at 615, and Barnes, 68 Fed. Cl. at 499.  Among the factors to be considered in determining superiority are (1) the potential "class members' interests in individually controlling the prosecution of separate actions," (2) "the extent and nature of any litigation concerning the controversy already begun by class members," and (3) "the likely difficulties in maintaining a class action."  RCFC 23(b)(3).  A class action is appropriate if it would be impossible or impractical for individual parties to obtain compensation absent "the efficiencies and economies of a class action."  Curry, 81 Fed. Cl. at 338.

"Essentially, under this prong of the analysis, the court is obliged to conduct a cost/benefit analysis, weighing any potential problems with the manageability or fairness of a class action against the benefits to the system and the individual members likely to be derived from maintaining such an action."  Barnes, 68 Fed. Cl. at 499, quoted in Geneva Rock Prods., 100 Fed. Cl. at 790; see also Jaynes, 69 Fed. Cl. at 459 ("In making [the superiority] assessment, the court must consider what alternative procedures are available for disposing of the dispute and compare the possible alternatives to determine whether Rule 23 will be sufficiently effective to justify the class action approach.  The superiority requirement is most clearly satisfied if a comparative evaluation of other procedures reveals no other realistic possibilities." (citation and internal quotation marks omitted)).

Plaintiff asserts that "a cost-benefit analysis favors class certification."  Pl.'s Mot. Class Cert. 12.  Defendant does not contest this assertion.  Plaintiff notes that although many class members hold multiple pre-1993 unpatented nonplacer claims, each claim is worth only $140.  Since each claim is very small, individual putative class members hold little, if any, interest in separately pursuing their own suits.  The cost of doing so would likely be prohibitive for all but perhaps a small fraction of putative class members, but even a small fraction of an estimated 69,000 potential claimants, see supra Part III.B, pursuing individual recoveries would significantly strain already-scarce judicial resources.  Therefore, as plaintiff asserts, "the manageability of administering these claims through the class action process outweighs any benefit to the system and to individual members derived through individual [litigation]."  Id. at 13.  Further, plaintiff indicates that identifying and notifying eligible pre-1993 claimants and calculating individual damages is easily accomplished via the BLM database.  See Curry, 81

---

[23]  There are several other methods of adjudicating the claims of multiple parties arising from the same course of conduct:  permissive joinder under RCFC 20, filing a related case under RCFC 40.2, and consolidation under RCFC 42(a).  Procedurally, RCFC 20 requires a motion to amend the complaint to join new plaintiffs, while RCFC 40.2 and RCFC 42(a) require the filing of separate complaints.

Fed. Cl. at 338 ("The Court does not find identifying or notifying potential class members to be particularly daunting, given the records at the government's disposal.").

The court agrees with plaintiff that, as in Curry, "[t]he cost-benefit analysis tips decidedly in favor of class certification." Id. This case is the quintessential class action because it involves thousands of plaintiffs who were subjected to the same governmental wrongdoing and whose recovery is likely to be very small. Absent a class action, pre-1993 claimants would likely not seek legal redress, which is apparent by the lack of any similar litigation that this court or the parties are aware of. In addition, it will be easy to identify and notify potential class members and calculate individual damages. Accordingly, plaintiff has satisfied the superiority requirement for class action certification.

## IV.  CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed herein, they are unpersuasive, without merit, or are unnecessary for resolving the matters currently before the court.

There are no genuine issues of material fact. As set forth above, plaintiff is entitled to recover the 2013 maintenance fees paid on its pre-1993 unpatented nonplacer claims. Neither the voluntary payment doctrine nor the anti-windfall doctrine bar plaintiff's illegal exaction claim. Accordingly, plaintiff's motion for summary judgment is **GRANTED**, and defendant's cross-motion for summary judgment is **DENIED**.

Further, plaintiff has satisfied the numerosity, commonality, typicality, adequacy, and superiority requirements for class action certification. Accordingly, plaintiff's motion for class certification and appointment of class counsel under RCFC 23 is **GRANTED**.

Pursuant to RCFC 23(c)(1), the court declares:

- The class is defined as:

    With respect to an unpatented lode mining claim, unpatented mill site, or unpatented tunnel site located pursuant to the mining laws of the United States prior to August 10, 1993, for which a claim maintenance fee for such claim or site for assessment year 2013 was timely paid to the United States Secretary of the Interior on or before September 1, 2012, each and every person who, at the time of such payment, was the holder of all or any part of such claim or site, unless a waiver under 30 U.S.C. § 28f(d) pertaining to the claim or site was in place for assessment year 2013.

- The class claim concerns the 2013 maintenance fees paid on pre-1993 unpatented nonplacer claims.

- Plaintiff shall be the class representative.  All future filings shall bear the following caption:

```
************************************
SILVER BUCKLE MINES, INC.,          *
     for Itself and as Representative of a   *
     Class of Similarly Situated Parties,    *
                                    *
                    Plaintiff,      *        No. 13-476C
                                    *        Judge Margaret M. Sweeney
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
                    Defendant.      *
************************************
```

- Frank R. Siderius is appointed as class counsel.

The parties shall file a joint status report proposing a plan to satisfy the notice requirements of RCFC 23(c)(2) and suggesting a schedule for further proceedings **no later than Friday, June 23, 2017**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge